1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   EZEKIEL ISIAH DELGADO,                    No.  2:21-cv-1084 TLN DB P

12              Petitioner,

13       v.                                    FINDINGS AND RECOMMENDATIONS

14   NEIL McDOWELL,

15              Respondent.

16

17         Petitioner is a state prisoner proceeding through counsel with a petition for a writ of

18   habeas corpus under 28 U.S.C. §2254.  Petitioner challenges his conviction imposed by the

19   Sacramento County Superior Court in 2020 for two counts of first-degree murder with a special

20   circumstance of multiple murders and one count of discharging a firearm into an occupied

21   vehicle.  Petitioner was sentenced to a term of 100 years to life.  Petitioner raises the following

22   claims:  (1) his statements to police were obtained in violation of his Miranda rights; (2) his

23   statements were obtained as the result of an unlawful arrest; (3) there was insufficient evidence of

24   premeditation and deliberation; (4) a jury instruction on felony murder violated due process; (5)

25   an inadequate instruction on the defense of voluntary intoxication violated due process; and (6)

26   the cumulative effect of all errors violated due process.  For the reasons set forth below, this court

27   will recommend the petition be denied.

28   ////

1

1

## BACKGROUND

2

### I. Facts Established at Trial

3

The California Court of Appeal for the Third Appellate District provided the following

4

factual summary:

5

> Near midnight on April 9 to 10, 2014, defendant, then aged 16, went
> with Taylor Cober and Elose Brown, purportedly to buy a small
> amount of marijuana. The seller (DeShawne Cannon) and his female
> companion (Gina Elarms) were sitting in a sedan. Brown had $40
> and defendant gave Brown his wallet with $25 in it; the total was less
> than the agreed-upon amount of $70. Defendant told a detective he
> thought Cannon was reaching for a gun, so he shot him. He then shot
> Elarms because she could identify him, then shot Cannon again. He
> emptied his 10-shot pistol from behind, striking Cannon five times
> and Elarms at least three times. His admissions and reenactment were
> video recorded and shown to the jury. Defendant and Brown each
> claimed to have taken Elarms's purse, splitting the money contained
> therein.

6

7

8

9

10

11

12

> Brown and Cober were given immunity and testified they thought
> the plan was to buy marijuana. Brown heard the shooting but claimed
> not to have seen it. Later, defendant told Brown he thought Cannon
> was preparing to shoot and defendant shot him to protect Brown.
> Cober testified defendant admitted shooting someone. In confusing
> passages, Cober testified there may have been mention of doing a
> "lick" (robbery) earlier, but he had thought it was said in jest.

13

14

15

16

> There was corroborative but inconclusive testimony from two
> witnesses about the perceived ethnicity and clothing of people they
> saw leaving after the shootings. A review of defendant's telephone
> revealed searches for stories about the incident and inquiries about
> Amtrak and Greyhound schedules.

17

18

19

> The defense theory was that defendant falsely confessed to protect
> his friends and earn street credibility. No robbery had been planned.
> At worst defendant acted rashly, not with deliberation, after he
> thought Cannon was going to pull a weapon. This would be voluntary
> manslaughter, via an imperfect self-defense theory.

20

21

22

> The prosecutor argued for premeditated murder because defendant
> had time to reflect, fired at least five times at Cannon, shot Elarms at
> least three times, then shot Cannon again. Felony murder also could
> apply because from the evidence it was rational to infer a plan to rob
> the seller.

23

24

25

(ECF No. 17-13 at 3-4.[1])

26

---

27

[1] Respondent lodged the state court record. (See ECF No. 17.) The Court of Appeal's decision
on petitioner's Miranda and arrest claims was published. People v. Delgado, 27 Cal. App. 5th
1092 (2018). Its decision on the remaining claims was not published. Herein, for consistency,
this court cites to the copy of the Court of Appeal's decision lodged by respondent.

28

1    **II.  Procedural Background**

2         **A.  Judgment and Sentencing**

3         The jury convicted petitioner of all charges:  two counts of first-degree murder and one

4    count of discharging a firearm at an occupied vehicle.  In addition, the jury found true a multiple-

5    murder special circumstance and found that petitioner personally used a firearm causing death.

6    The trial court sentenced petitioner to prison for a total unstayed term of 100 years to life.

7         **B.  State Appeal and Federal Proceedings**

8         On appeal, the Court of Appeal remanded to the superior court for a juvenile transfer

9    hearing and for the superior court to exercise its discretion, pursuant to an intervening law,

10   regarding firearm enhancements.  (ECF No. 17-13 at 29.)  In July 2020, the superior court

11   affirmed the previously imposed sentence of 100 years to life.  (ECF No. 17-18.)  In all other

12   respects, the Court of Appeal affirmed.  (ECF No. 17-3.)

13        The California Supreme Court denied petitioner's petition for review without comment.

14   (ECF No. 17-17.)  Petitioner did not file any petitions for a writ of habeas corpus with the state

15   courts.

16        Petitioner filed the present §2254 petition on June 21, 2021.  (ECF No. 1.)  After

17   respondent filed an answer (ECF No. 16), this court granted petitioner's motion for the

18   appointment of counsel.  (ECF No. 19.)  On August 8, 2022, petitioner, through counsel, filed a

19   traverse.  (ECF No. 32.)

20        **STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

21        An application for a writ of habeas corpus by a person in custody under a judgment of a

22   state court can be granted only for violations of the Constitution or laws of the United States.  28

23   U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

24   application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502

25   U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

26        Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

27   corpus relief:

28   ////

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "'may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably.'"  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 567 U.S. 37 (2012)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct."  Id. at 64.  Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 76-77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams, 529 U.S. at 405-06).  "Under the 'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.'"  Lockyer v. Andrade, 538 U.S. 63, 75 (2003)

4

1    (quoting Williams, 529 U.S. at 413); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  "[A]

2    federal habeas court may not issue the writ simply because that court concludes in its independent

3    judgment that the relevant state-court decision applied clearly established federal law erroneously

4    or incorrectly.  Rather, that application must also be unreasonable."  Williams, 529 U.S. at 411;

5    see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Andrade, 538 U.S. at 75 ("It is not

6    enough that a federal habeas court, in its independent review of the legal question, is left with a

7    firm conviction that the state court was erroneous." (Internal citations and quotation marks

8    omitted.)).  "A state court's determination that a claim lacks merit precludes federal habeas relief

9    so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

10   Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652,

11   664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a

12   state prisoner must show that the state court's ruling on the claim being presented in federal court

13   was so lacking in justification that there was an error well understood and comprehended in

14   existing law beyond any possibility for fairminded disagreement."  Richter, 562 U.S. at 103.

15           There are two ways a petitioner may satisfy subsection (d)(2).  Hibbler v. Benedetti, 693

16   F.3d 1140, 1146 (9th Cir. 2012).  He may show the state court's findings of fact "were not

17   supported by substantial evidence in the state court record" or he may "challenge the fact-finding

18   process itself on the ground it was deficient in some material way."  Id. (citing Taylor v. Maddox,

19   366 F.3d 992, 999-1001 (9th Cir. 2004), abrogated by Murray v. Schriro, 745 F.3d 999-1000 (9th

20   Cir. 2014[2]); see also Hurles v. Ryan, 752 F.3d 768, 790-91 (9th Cir. 2014) (If a state court makes

21   factual findings without an opportunity for the petitioner to present evidence, the fact-finding

22   process may be deficient and the state court opinion may not be entitled to deference.). Under the

23   _____

24   [2] In Kipp v. Davis, 971 F.3d 939, 953 n.13 (9th Cir. 2020), the Court of Appeals explained the
     effect of the decision in Murray on Taylor:

25           In Murray I, we recognized that Pinholster foreclosed Taylor's suggestion that an
             extrinsic challenge, based on evidence presented for the first time in federal court, may

26           occur once the state court's factual findings survive any intrinsic challenge under section
             2254(d)(2). Murray I, 745 F.3d at 999–1000. Kipp does not present an extrinsic challenge

27           so Murray I's abrogation of Taylor on this ground is irrelevant here.

     Similarly, in the present case, there is no extrinsic challenge based on evidence presented for the
28   first time in federal court so Murray's limitation of Taylor is not relevant.

1   "substantial evidence" test, the court asks whether "an appellate panel, applying the normal

2   standards of appellate review," could reasonably conclude that the finding is supported by the

3   record.  Hibbler, 693 F.3d at 1146 (9th Cir. 2012).

4        The second test, whether the state court's fact-finding process is insufficient, requires the

5   federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-

6   finding process] is pointed out would be unreasonable in holding that the state court's fact-finding

7   process was adequate."  Hibbler, 693 F.3d at 1146-47 (quoting Lambert v. Blodgett, 393 F.3d

8   943, 972 (9th Cir. 2004)).  The state court's failure to hold an evidentiary hearing does not

9   automatically render its fact finding process unreasonable.  Id. at 1147.  Further, a state court may

10  make factual findings without an evidentiary hearing if "the record conclusively establishes a fact

11  or where petitioner's factual allegations are entirely without credibility."  Perez v. Rosario, 459

12  F.3d 943, 951 (9th Cir. 2006) (citing Nunes v. Mueller, 350 F.3d 1045, 1055 (9th Cir. 2003)).

13       The court looks to the last reasoned state court decision as the basis for the state court

14  judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

15  "[I]f the last reasoned state court decision adopts or substantially incorporates the reasoning from

16  a previous state court decision, [this court] may consider both decisions to 'fully ascertain the

17  reasoning of the last decision.'"  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en

18  banc) (quoting Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005)).  "When a federal claim

19  has been presented to a state court and the state court has denied relief, it may be presumed that

20  the state court adjudicated the claim on the merits in the absence of any indication or state-law

21  procedural principles to the contrary."  Richter, 562 U.S. at 99.  This presumption may be

22  overcome by showing "there is reason to think some other explanation for the state court's

23  decision is more likely."  Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

24  Similarly, when a state court decision on a petitioner's claims rejects some claims but does not

25  expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that

26  the federal claim was adjudicated on the merits.  Johnson v. Williams, 568 U.S. 289, 293 (2013).

27  When it is clear, that a state court has not reached the merits of a petitioner's claim, the

28  deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court

6

1    must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099,

2    1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

3         If a petitioner overcomes one of the hurdles posed by section 2254(d), the federal court

4    reviews the merits of the claim de novo.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir.

5    2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear

6    both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is

7    such error, we must decide the habeas petition by considering de novo the constitutional issues

8    raised.").  For the claims upon which petitioner seeks to present evidence, petitioner must meet

9    the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual

10   basis of [the] claim in State court proceedings" and by meeting the federal case law standards for

11   the presentation of evidence in a federal habeas proceeding.  See Cullen v. Pinholster, 563 U.S.

12   170, 186 (2011).

## ANALYSIS

14        Petitioner raises the following claims:  (1) his statements to police were obtained in

15   violation of his Miranda rights; (2) his statements were obtained as the result of an unlawful

16   arrest; (3) there was insufficient evidence of premeditation and deliberation; (4) a jury instruction

17   on felony murder violated due process; (5) an inadequate instruction on the defense of voluntary

18   intoxication violated due process; and (6) the cumulative effect of all errors violated due process.

19        The federal court looks to the last reasoned decision of the state court on petitioner's

20   claims.  Because the California Supreme Court summarily denied petitioner's claims, this court

21   looks to the decision of the Court of Appeal.

## I.  **Miranda** Violation

23        Petitioner argues the state court's denial of his motion to suppress incriminating

24   statements he made to police violated his rights under Miranda v. Arizona, 396 U.S. 868 (1969).

25   Petitioner contends the police employed an unconstitutional two-step interrogation by reading his

26   Miranda rights only after he had incriminated himself.  At trial, the prosecution was permitted to

27   use both petitioner's pre-Miranda statements and post-Miranda statements.  While the state

28   appellate court found petitioner's pre-Miranda statements should have been suppressed, it found

7

petitioner's post-Miranda statements admissible.  Petitioner argues that in coming to that

conclusion, the state court unreasonably applied clearly established federal law and unreasonably

determined the facts.

### A. Legal Standards

The Fifth Amendment provides that "no person shall be compelled in any criminal case to

be a witness against himself."  A suspect subject to custodial interrogation also has a Fifth

Amendment right to consult with an attorney, and the police must explain this right prior to

questioning.  Miranda v. Arizona, 384 U.S. 436, 469-73 (1966).  In Miranda, the United States

Supreme Court held that "[t]he prosecution may not use statements, whether exculpatory or

inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the

use of procedural safeguards effective to secure the privilege against self-incrimination."  Id. at

444.  To this end, custodial interrogation must be preceded by advice to the potential defendant

that he or she has the right to consult with a lawyer, the right to remain silent and that anything

stated can be used in evidence against him or her.  Id. at 473-74.  These procedural requirements

are designed "to protect people against the coercive nature of custodial interrogations."

DeWeaver v. Runnels, 556 F.3d 995, 1000 (9th Cir. 2009).

### 1. Voluntary Waiver

A suspect may waive his Miranda rights, provided the waiver is "voluntary in the sense

that it was the product of a free and deliberate choice rather than intimidation, coercion, or

deception," and "made with a full awareness of both the nature of the right being abandoned and

the consequences of the decision to abandon it."  Moran v. Burbine, 475 U.S. 412, 421 (1986)

(citation omitted).  But an express waiver of Miranda rights is not necessary.  Berghuis v.

Thompkins, 560 U.S. 370, 384 (2010); North Carolina v. Butler, 441 U.S. 369, 373-75 (1979).

Instead, a valid waiver of rights may be implied under the circumstances presented in the

particular case.  See Berghuis, 560 U.S. at 384; Butler, 441 U.S. at 373.  As a general proposition,

the "law can presume that an individual who, with a full understanding of his or her rights, acts in

a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection

those rights afford."  Berghuis, 560 U.S. at 385.  For instance, "a suspect may impliedly waive the

1  rights by answering an officer's questions after receiving *Miranda* warnings." United States v.

2  Rodriguez, 518 F.3d 1072, 1080 (9th Cir. 2008) (citation omitted); see Butler, 441 U.S. at 373 (A

3  valid waiver of Miranda rights may be implied through "the defendant's silence, coupled with an

4  understanding of his rights and a course of conduct indicating waiver."); Terrovona v. Kincheloe,

5  912 F.2d 1176, 1179 (9th Cir. 1990).  "An 'implicit waiver' of the 'right to remain silent' is

6  sufficient to admit a suspect's statement into evidence." Berghuis, 560 U.S. at 384 (citation

7  omitted).

8  **2. Two-Step Interrogation**

9  In 1985, the United States Supreme Court addressed the admissibility of a confession

10  obtained after a Miranda warning but preceded by the suspect's earlier unwarned and

11  incriminating statements.  The Court held that "the admissibility of any subsequent statement

12  should turn . . . solely on whether it is knowingly and voluntarily made." Oregon v. Elstad, 470

13  U.S. 298, 309 (1985).

14  In Missouri v. Seibert, 542 U.S. 600 (2004), the Supreme Court considered a related

15  question - the admissibility of a confession obtained through the deliberate use of a two-step

16  interrogation strategy.  The Ninth Circuit has defined a two-step interrogation as one that involves

17  "eliciting an unwarned confession, administering the *Miranda* warnings and obtaining a waiver of

18  *Miranda* rights, and then eliciting a repeated confession." United States v. Narvaez-Gomez, 489

19  F.3d 970, 973-74 (9th Cir. 2007) (citation omitted).  In Seibert, the Supreme Court, in a plurality

20  opinion, held that when the two-step strategy is used, the admissibility of the postwarning

21  statement should depend on whether the "*Miranda* warnings delivered midstream could be

22  effective enough to accomplish their object." Seibert, 542 U.S. at 615 (Souter, J., plurality

23  opinion).  In a concurrence, Justice Kennedy determined that when law enforcement deliberately

24  withholds Miranda warnings until after obtaining an in-custody confession and insufficient

25  curative measures have been taken to ensure that the suspect understood the meaning and

26  importance of the previously withheld warnings, a voluntary postwarning confession must be

27  excluded. Id. at 621-22 (Kennedy, J., concurring in the judgment).  Where there was no

28  ////

1    deliberateness, Justice Kennedy opined that admissibility of the postwarning statements should be

2    governed by the principles set out in Elstad.  Id. at 622.

3        In United States v. Williams, 435 F.3d 1148 (9th Cir. 2006), the Ninth Circuit adopted

4    Justice Kennedy's concurrence and held that the narrower test of looking for a deliberate two-step

5    strategy along with an objectively ineffective mid-stream warning represented Seibert's holding.

6    Williams, 435 F.3d at 1158.  In order to determine whether an interrogator used a deliberate two-

7    step strategy, courts should consider "whether objective evidence and any available subjective

8    evidence, such as an officer's testimony, support an inference that the two-step interrogation

9    procedure was used to undermine the *Miranda* warning." Id. (citations omitted).  "[O]bjective

10   evidence would include the timing, setting and completeness of the prewarning interrogation, the

11   continuity of police personnel and the overlapping content of the pre-and postwarning

12   statements." Id. at 1159 (citations omitted).  The absence of subjective evidence is not

13   dispositive.  Reyes v. Lewis, 833 F.3d 1001, 1030 (9th Cir. 2016) (citation omitted).

14       Justice Kennedy's concurrence constitutes "clearly established law" for purposes of

15   analysis under 28 U.S.C. § 2254(d).  See Reyes, 833 F.3d at 1028.  The clearly established rule

16   under Seibert, according to Reyes, is that "if officers deliberately employ the two-step technique

17   employed in *Seibert*, and if insufficient curative measures are taken to ensure that later *Miranda*

18   warnings are genuinely understood, any warned statement thereby obtained must be suppressed

19   even if the statement is voluntary."  Id. at 1029.

20       **B.  Decision of the State Court**

21       The Court of Appeal found that petitioner's Miranda rights were violated when he made

22   the first incriminating statements but his statements made after he received Miranda warnings

23   were not tainted by his prior statements.  The Court of Appeal concluded that petitioner's second

24   confession was voluntary and, because the second confession was more detailed than the first, the

25   initial Miranda violation was harmless error.

26       Because the facts overlap, the Court of Appeal considered petitioner's Miranda claim and

27   unlawful arrest claim together.  In his federal petition, petitioner raises them as separate claims.

28   ////

10

This court considers the Miranda claim here and the unlawful arrest claim in the following section.

The Court of Appeal first provided an overview of the issues and its decision:

> Although we do not agree entirely with defendant, we agree that many mistakes were made. As we will describe, the communication among the involved detectives was inadequate to say the least.
>
> Two seasoned detectives in the first team arrested defendant under the mistaken belief there was an outstanding warrant for his arrest. They took him in handcuffs to the station, seized his belongings including his cell phone, and left him shackled in an interrogation room for nearly an hour and a half. They did not tell the second team they had arrested and shackled him. They did not *Mirandize* him.
>
> When the first detective in the second team found defendant, he immediately unshackled him, told him he was not under arrest and was free to leave, and a ride would be arranged for him. Defendant answered some questions, but made no inculpatory statements. After defendant was left in that room again, a second detective from the second team came in and immediately demanded that defendant unlock his cell phone so its contents could be retrieved. Although this detective also initially told defendant he was not under arrest, when defendant asked how long he would be there, the detective indicated the answer hinged on completion of the data retrieval process. He then questioned defendant at length. When defendant eventually admitted that he had shot the victims, a third detective in the second team--who had been watching through a one-way mirror--told the second detective via text message that it was time to *Mirandize* defendant. That was done, defendant was invited to repeat what he said, and he repeated and elaborated on his admissions, spontaneously moving chairs to reenact the crimes.
>
> In a detailed written ruling, the trial court found defendant was in custody at the beginning, was freed from custody by the first interrogator, but was not back into custody until he admitted to the second interrogator that he had shot the victims. The court found defendant's statements, including those after the *Miranda* warnings, were voluntary, and not the product of a deliberate plan to evade *Miranda*.
>
> We disagree with the trial court's determination of when custody was reinstated. When the second interrogator demanded access to defendant's cell phone and indicated he could not leave until it was examined, defendant was back in custody, and therefore his unwarned statements should have been excluded. No reasonable person would have felt free to leave at that time under these circumstances. However, precedent dictates that absent a deliberate policy or practice to evade *Miranda*, a subsequent voluntary warned confession is admissible notwithstanding a prior unwarned confession. (See *Missouri v. Seibert* (2004) 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643; *People v. Camino* (2010) 188 Cal.App.4th 1359, 116 Cal.Rptr.3d 173 (*Camino*).) Although all of defendant's

unwarned statements should have been suppressed as the products of a custodial interrogation without a *Miranda* waiver, the finding that the subsequent warned confession was voluntary is supported by the record.

The subsequent warned confession was cumulative of and more detailed than the unwarned confession. Therefore, we conclude beyond a reasonable doubt that the *Miranda* violation did not contribute to the verdicts and was not prejudicial to defendant. (See *Chapman v. California* (1967) 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.)

Our conclusion should not be read to condone the multiple inexplicable failures to communicate and other mistakes demonstrated by this record.

(ECF No. 13-3 at 5-6.)

The Court of Appeal then examined the evidence presented at the suppression hearing, the arguments of trial counsel, and the trial court's ruling:

*B. Facts at Suppression Hearing*

Detective Brian Meux (who had about 20 years as a peace officer) testified Cannon's cell phone was found at the crime scene and pointed the investigation to Brown, who had texted Cannon (using the moniker "WK Lynch") about a marijuana deal shortly before the killings. Meux helped execute a search warrant at Brown's residence beginning about 5:15 p.m. on April 11, 2014. Meux and fellow detectives, Angela Kirby and Jason Lonteen, had investigated Brown's associates via sheriff's records and social media, and linked Brown with a man named "Lynch" and defendant. When the warrant was executed, defendant, Cober, Brown, and some of Brown's relatives were present, and the team wanted to talk to all of them.

Although Meux apparently did not know this, Detectives French and Roberts had brought defendant to the station in handcuffs, taken his belongings, and shackled him to the floor of an interrogation room. The video shows they left defendant at about 6:54 p.m. Meux did not come in the room until about 8:18 p.m., meaning defendant was left shackled to the floor and alone in the room for nearly an hour and a half.

Meux testified he first spoke to Brown and his mother, and then went to the room where defendant was held. Meux was surprised to find him in shackles and freed him to use the bathroom; according to Meux, defendant was not then a suspect in the murders. Because of the way he had found defendant, Meux assured him that he was not under arrest, was free to leave, and did not have to talk. The video recording (with audio) shows that Meux offered to get defendant a ride or to have someone pick him up but did not wait for defendant's verbal response before beginning questioning. Meux understood that at Brown's house defendant had given officers a false name, and at some point Meux learned he was on probation. Defendant had said

he had an outstanding arrest warrant, but eventually Detective Rose told Meux that he could find no such warrant.

Meux questioned defendant about his whereabouts at the time of the crimes, and although defendant denied involvement he gave answers that conflicted with information Cober had provided, leading Meux to conclude defendant was lying. Accordingly, Meux had pressed defendant to tell him the truth. When he left the room, Meux told defendant he was going to close the door so other people would not see defendant, but that the door was not locked and defendant was not under arrest. Meux left the station to try to find Lynch, who was still considered a prime suspect, but suggested that Detective Lonteen question defendant. Before Meux found Lynch, he heard from Detective Kirby that defendant had admitted the shooting; he told her he had not *Mirandized* defendant, he had merely given defendant the standard *Beheler* admonitions applicable to non-arrested persons. (See *California v. Beheler* (1983) 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275.)

On cross-examination Meux testified that although he asked defendant if he had been involved in the murder, and told defendant he did not believe him, he still thought defendant was a witness rather than a suspect. Meux also testified that before Lonteen questioned defendant, Detective Rose told Meux that defendant did not have a warrant, and Meux believed Lonteen was present and knew this.

Lonteen (who had 16 years as a peace officer) testified he had been interviewing Brown's mother and sister and did not watch Meux interview defendant. Meux had told Lonteen that Meux did not believe defendant was truthful about his whereabouts, and Meux's summary to Lonteen of defendant's statements did not match what Lonteen had heard from Brown's relatives. Lonteen did not know defendant had been arrested and recalled nothing about a warrant.

The video shows that Meux left the room at about 8:45 p.m., and about 15 minutes later someone showed defendant to the bathroom; defendant was returned to the room at about 9:06 p.m., and about 10 minutes later Lonteen entered the room. Lonteen found that the door was ajar and defendant was not restrained. Lonteen demanded that defendant provide the password to unlock his cell phone (which previously had been taken from him); defendant unlocked it and gave Lonteen the password, and Lonteen told defendant the cell phone's contents would be downloaded by the police.

The transcript shows (consistent with the video) that Lonteen entered the room and immediately after identifying himself said:

"[Lonteen:] [H]ere's the thing dude. *We gotta verify some stuff. We need to get in your phone*. What's the passcode?

"[Defendant:] For - what is this for?

"[Lonteen:] Just to go through - we've got to go through some of this stuff man to make sure you're telling us on the up and up. All right?

"[Defendant:] Yeah.

"[Lonteen:] So I'm trying to help you out by doing that. I just want to try to give you an opportunity so we can do that. So, um, *you can punch it in or I can do it. It's up to you.*" (Italics added.)

Lonteen testified defendant asked him how long defendant would be there because Meux had told him he was free to go; Lonteen confirmed that defendant was free to go. But the transcript (and video) reflects that the following occurred:

"[Defendant:] And, ah, how long am I gonna be here?

"[Lonteen:] *We're trying to figure that out right now....*

"[Defendant:] Because . . the other man [i.e., Meux] told me that I'm not under arrest or anything so.

"[Lonteen:] Okay, yeah. That's true."

"[Defendant:] I just - that - that's why I just want to know how long am I gonna be here.

"[Lonteen:] *We're gonna try to make it not too much longer*. I'm gonna dump this off. I'm gonna have it - I'll be right back to talk to you and just ask you a few more questions, okay?

"[Defendant:] All right.

"[Lonteen:] Um, in case this [cell phone] locks up again what is [the code]?

"[Defendant:] 7400." (Italics added.)

Thus, although Lonteen told defendant the police would try to expedite the download so that defendant could leave, he did not at that point tell defendant he could leave at any time of defendant's choosing. Leaving hinged on completion of the download.

After Lonteen dropped the cell phone off for review, he returned to question defendant, telling him his account of his whereabouts did not make sense. Eventually, after Lonteen repeatedly told defendant he did not believe him, at about 9:56 p.m. (i.e., after about 35 minutes of questioning) defendant admitted he had shot the victims. About six or seven minutes later, Kirby texted Lonteen to tell him to *Mirandize* defendant.

Kirby (who had 20 years as a peace officer) testified that at Brown's residence defendant had given a false name and she knew it was false and that he was on juvenile searchable probation and was an associate of Brown's. Detectives French and Roberts told her defendant had told them he thought he had an outstanding arrest warrant. After Meux's interview, someone told her the lack of a warrant had been confirmed. When she heard defendant make

admissions to Lonteen, she texted Lonteen to tell him to *Mirandize* defendant.

After briefly leaving and returning to give defendant some water and chips, Lonteen returned to the room and read defendant his *Miranda* rights; defendant said he understood them. This was at about 10:18 p.m.

Before he was *Mirandized*, defendant had told Lonteen that he and Brown went to buy some marijuana and defendant shot Cannon when he reached for something shiny that defendant feared was a gun; he also shot Elarms. Neither Brown nor Cober knew defendant had a gun. Defendant said he took Elarms's purse after shooting her. The purse was thrown away near an apartment. His friends had nothing to do with any of this.

After the *Miranda* warnings, defendant explained what happened in more detail. In particular, and on his own initiative, defendant moved chairs around to show the position of the victims in the car and where he was when he shot each one. His performance showed he was standing outside the car on the passenger's side, behind the victims. He then demonstrated how he fired his gun at each of them in turn, replete with sound effects. The video shows defendant appeared eager to tell his story and freely did so.

*C. Argument and Ruling*

Defense counsel argued correctly that juveniles do not get bail (see *Tiffany A. v. Superior Court* (2007) 150 Cal.App.4th 1344, 1361, 59 Cal.Rptr.3d 363), and reasoned therefrom that even if there had been an arrest warrant, defendant would have been in custody as a matter of law. If there had not been an arrest warrant, he should not have been arrested at all, meaning the products of his arrest (his admissions) should be excluded. Counsel argued that although there was no evidence of a plan to evade Miranda, Lonteen made a decision not to *Mirandize* defendant until Kirby told him to do so, and there was no substantial break in the questioning, therefore the warned admissions should be suppressed.

The prosecutor argued that defendant told the detectives he had an outstanding warrant, and confirmed this at the station before he was told to empty his pockets and shackled to the floor. Meux later unshackled defendant and told him he was free to go.

The trial court gave an initial oral ruling, followed by a more detailed written ruling at the end of trial. The following summary incorporates both rulings.

First, French and Roberts lawfully arrested defendant in the reasonable belief that there was an outstanding warrant for his arrest, based on what defendant himself told them. Defendant was in custody then.

Second, defendant was involuntarily transported to the station, where he was shackled to the floor and had all his property taken, showing

he remained in custody. But because he had not said anything the People wanted to introduce, there was no evidence to exclude from that period.

Third, Meux expressed genuine surprise at discovering defendant was shackled, unshackled him, told him he was not under arrest and was free to leave, and offered him a ride. At that point defendant was freed from custody; this was not a planned ruse to trick him into talking, even given defendant's age.

Fourth, once defendant told Lonteen that he shot the victims, he was again in custody because no reasonable person (whether an adult or a 16-year-old) would think he or she could leave.

Fifth, the officers had no policy or plan to circumvent *Miranda*.

Sixth, defendant's statements were voluntary.

Accordingly, the motion to suppress was denied.

(ECF No. 13-3 at 6-12.)

In subsection 1, the Court of Appeal considered petitioner's claims that his arrest and detention lacked probable cause and that his detention was unlawfully prolonged. The court rejected both arguments. This court discusses the arrest and detention issues in the following section. The Court of Appeal then considered petitioner's <u>Miranda</u> claim.

### 2. *Miranda Violation*

Defendant contends all his statements should have been suppressed for violation(s) of the *Miranda* rules, arguing that he was in custody from the beginning. We agree with defendant in part, as we now explain.

" 'In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under *Miranda* ..., the scope of our review is well established. "We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained." ' [Citation.] ' "Although we independently determine whether, from the undisputed facts and those properly found by the trial court, the challenged statements were illegally obtained [citation], we ' "give great weight to the considered conclusions" of a lower court that has previously reviewed the same evidence.' " ' [Citation.]" (*Camino, supra,* 188 Cal.App.4th at pp. 1370-1371 [116 Cal.Rptr.3d 173].)

*Miranda* applies only to custodial interrogations, and whether a person is in custody hinges on whether a reasonable person in her or his shoes would feel free to leave. (See *Howes v. Fields* (2012) 565 U.S. 499, 508-509, 132 S.Ct. 1181, 182 L.Ed.2d 17; *People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1161-1162, 59 Cal.Rptr.2d 587.) We take the juvenile's age into consideration when determining whether a reasonable person would feel free to leave under the same circumstances. (See *In re I.F.* (2018) 20 Cal.App.5th 735, 760, 229 Cal.Rptr.3d 462.) Although Meux effectively freed defendant from custody, Lonteen renewed his custodial status, as we now explain.

We begin by pointing out the obvious: that cell phones are now ubiquitous and often contain highly private personal information. Although the trial court found that: "When Lonteen entered the interview room with defendant Delgado, he introduced himself and *asked* Delgado for the access code for his cell phone so he could do a 'dump' of its contents" (italics added), this finding is not fully supported by the record. Lonteen *demanded* access. When defendant asked when he could leave, Lonteen indicated it depended on when the data was obtained. In effect, defendant asked to leave and Lonteen denied his request.

At that point defendant, aged 16, had been arrested, taken in handcuffs to the station, shackled to the floor of an interrogation room, forced to give up his possessions, and left alone in that room for nearly an hour and a half. Although Meux thereafter effectively freed him, there were lingering indicia of custody that must be factored in to the reasonable-person calculus to answer the custody question as of the time Lonteen spoke to defendant. At that moment, defendant told Lonteen that Meux had told defendant he was free to leave. Lonteen then demanded access to defendant's cell phone, and when defendant asked when he could leave, indicated the data extraction would have to be done first. Given the entire course of events, no reasonable person, whether adult or juvenile, would have felt free to leave at that time. Accordingly, Lonteen should not have asked defendant any questions before *Mirandizing* him. Therefore, all of defendant's unwarned statements should have been suppressed, and the trial court's denial of the motion was error.

*3. Seibert and Voluntariness*

The trial court found the warned admissions were not the product of a planned effort to undermine the *Miranda* rule, but flowed from missteps and miscommunications. The court's finding that there was no subjective plan to evade *Miranda* is reviewed for substantial evidence. (See *Camino, supra*, 188 Cal.App.4th at pp. 1364, 1372, 116 Cal.Rptr.3d 173; *People v. Rios* (2009) 179 Cal.App.4th 491, 507, 101 Cal.Rptr.3d 713 (Rios).) There were multiple opinions in *Seibert*, which addressed this issue. The tie-breaking vote was by Justice Kennedy. Accordingly, we look to his opinion to determine the ground on which a majority of the high court agreed. (See *Camino*, *supra*, 188 Cal.App.4th at p. 1370 & fn. 5, 116 Cal.Rptr.3d 173; *Rios, supra*, 179 Cal.App.4th at pp. 504-505, 101 Cal.Rptr.3d 713.)

As background, *Oregon v. Elstad* (1985) 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 had rejected a "cat out of the bag" approach dictating that once an unwarned statement is made a subsequent warned statement is inadmissible because a person cannot effectively take back what she or he has said. Instead, *Elstad* held in part: "Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." (*Oregon v. Elstad, supra*, 470 U.S. at p. 309, 105 S.Ct. 1285.)

In *Seibert*, Justice Kennedy stated his controlling views in part as follows:

> "*Elstad* reflects a balanced and pragmatic approach to enforcement of the *Miranda* warning. *An officer may not realize that a suspect is in custody and warnings are required....*" (*Missouri v. Seibert, supra,* 542 U.S. at p. 620 [124 S.Ct. 2601], opn. of Kennedy, J., italics added.)

> "This case presents different considerations. The police used a two-step questioning technique based on a deliberate violation of *Miranda*. The *Miranda* warning was withheld to obscure both the practical and legal significance of the admonition when finally given." (*Id.* at p. 620 [124 S.Ct. 2601].)

> "*When an interrogator uses this deliberate, two-step strategy,* predicated upon violating *Miranda* during an extended interview, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps." (*Id.* at p. 621 [124 S.Ct. 2601], italics added.)

> "I would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used *in a calculated way* to undermine the *Miranda* warning. [¶] The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed." (*Id.* at p. 622 [124 S.Ct. 2601], italics added.)

In short, *Seibert* categorically barred admission of warned statements, whether voluntary or not, that are obtained by a deliberate attempt to thwart the *Miranda* safeguards. (See *Camino, supra*, 188 Cal.App.4th at pp. 1369-1370, 116 Cal.Rptr.3d 173; *Rios, supra*, 179 Cal.App.4th at pp. 504-505, 101 Cal.Rptr.3d 713.) The trial court made a factual finding that no proscribed two-step technique was employed in this case, and that finding is supported by the evidence recounted ante.

In various ways, defendant tries to fit this case within *Seibert*. In support, he relies on authority listing some objective indicia courts may consider in determining whether an intentional procedure was

used to circumvent *Miranda*. (See, e.g., *United States v. Williams* (9th Cir. 2006) 435 F.3d 1148, 1158-1159; *Camino, supra*, 188 Cal.App.4th at p. 1370, 116 Cal.Rptr.3d 173.) Although we ultimately determine the admissibility of evidence in the face of *Miranda* or voluntariness challenges, we are reviewing the trial court's factual finding regarding intent. " 'It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much a fact as anything else.' " (*Postal Service Bd. of Governors. v. Aikens* (1983) 460 U.S. 711, 716-717, 103 S.Ct. 1478, 75 L.Ed.2d 403; *see United States v. Williams* (2008) 553 U.S. 285, 306-307, 128 S.Ct. 1830, 170 L.Ed.2d 650; *People v. Johnson* (1901) 131 Cal. 511, 514, 63 P. 842.) We take Justice Kennedy's opinion as written: It requires a finding of a deliberate intent and plan to circumvent *Miranda*. We uphold the trial court's finding there was no such intention.

The record, far from suggesting any deliberate protocol to undermine *Miranda* guided the detectives, instead suggests they acted with little or no method at all. Further, we agree with the trial court that defendant's warned statements were "Where the voluntariness of a confession is raised on appeal, the reviewing court should examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was proper. If conflicting testimony exists, the court must accept that version of events that is most favorable to the People to the extent it is supported by the record. [Citation.]" (*In re Shawn D.* (1993) 20 Cal.App.4th 200, 207-208, 24 Cal.Rptr.2d 395.)

" '[T]he question in each case is whether the defendant's will was overborne at the time he confessed. ... The burden is on the prosecution to show by a preponderance of the evidence that the statement was voluntary. [Citation.] 'When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness.' [Citation.]" (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1401, 174 Cal.Rptr.3d 547.)

"A confession is involuntary under the federal and state guaranties of due process when it has been extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence. [Citation.] Coercive police activity is a necessary predicate to a finding that a confession was involuntary under both the federal and state Constitutions. [Citations.]" (*In re Joseph H.* (2015) 237 Cal.App.4th 517, 534, 188 Cal.Rptr.3d 171.)

We have watched the lengthy video and are convinced that no police coercion occurred and that defendant's will was not overborne. Defendant presents as a mature and savvy youth; he never appears cowed or browbeaten. The questioning was not abusive, and defendant had three restroom breaks, was given water twice, and was given a snack. During the post-warning period, entirely on his own initiative, he acted out the murders complete with sound effects. Nothing in the video indicates that defendant felt coerced in the

constitutional sense of the term at any time while he was being questioned.

Defendant's briefing points out that after defendant admitted the killings but just before he was *Mirandized* he asked: "Do you think I can make a phone call?" Lonteen told him he could, and when defendant asked if that meant only one Lonteen told defendant he could make more than one, then *Mirandized* him. But defendant did not ask to make any calls at that moment, and therefore this does not show his statements were involuntary. Put another way, this incident did not signal to defendant that he was being held incommunicado, as his briefing seems to imply. Nor do we find anything menacing in the fact that two different detectives questioned defendant over a few evening hours while expressing disbelief at his exculpatory story. The video refutes the claim of involuntariness.

Defendant suggests that he never voluntarily waived his *Miranda* rights. We disagree. After Lonteen *Mirandized* defendant and defendant separately said he understood each one of the four *Miranda* rights, the following occurred:

"[Lonteen:] Okay, I'm gonna kind of go back over a lot of these things that we talked about and make sure that again, I understand the right story. Are you okay with that?

"[Defendant:] You say what?

"[Lonteen:] Are you okay with doing that?

"[Defendant:] Going back?

"[Lonteen:] Just - just kind of going through again and making sure that I understand all the story.

"[Defendant:] Yeah, yeah, yeah."

Although the better practice is to obtain an explicit waiver of *Miranda* rights, an explicit waiver is not required. Lonteen ensured defendant understood his rights and wanted to talk; although not ideal, that was sufficient. "The core issue in ruling on a challenge to a *Miranda* waiver is whether an in custody accused made an uncoerced and fully aware choice not to assert the right to counsel or silence." (*Rios, supra*, 179 Cal.App.4th at p. 499, 101 Cal.Rptr.3d 713; *see People v. Whitson* (1998) 17 Cal.4th 229, 245-250, 70 Cal.Rptr.2d 321, 949 P.2d 18.) Defendant was aware of his choices and chose to talk. Because defendant's warned statements were voluntary and there was no plan to bypass *Miranda*, the warned statements were admissible under *Seibert* and related cases.

*4. Prejudice*

Because the trial court allowed the jury to hear (and watch) the unwarned admissions, we must decide whether the error was harmless beyond a reasonable doubt.

20

"The beyond-a-reasonable-doubt standard of *Chapman* 'requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.] 'To say that an error did not contribute to the ensuing verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citation.] Thus, the focus is what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is 'whether the ... verdict actually rendered in this trial was surely unattributable to the error.' [Citation.]" (*People v. Neal* (2003) 31 Cal.4th 63, 86 [1 Cal.Rptr.3d 650, 72 P.3d 280]; see *People v. Elizalde* (2015) 61 Cal.4th 523, 542 [189 Cal.Rptr.3d 518, 351 P.3d 1010].)

Another way to phrase the *Chapman* test is this: " 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " (*People v. Merritt* (2017) 2 Cal.5th 819, 827, 216 Cal.Rptr.3d 265, 392 P.3d 421.) Here, the answer is "yes."

Although we reject the Attorney General's initial view that the testimony of defendant's companions that night coupled with vague corroboration from eyewitnesses renders the error harmless, we agree that defendant's warned statements fully encompassed his unwarned statements, were more detailed, and included his spontaneous and vivid reenactment of the crimes. Defendant does not point to anything significant in the unwarned statements that was not repeated during the warned statements. Although during argument the prosecutor mentioned the point at which defendant said he would tell the truth, the prosecutor repeatedly emphasized the physical reenactment and described how that fit with the forensic evidence, arguing this showed defendant was telling the truth. Thus, the inadmissible evidence was at worst partly cumulative of the admissible evidence. Although defendant contends the statements were "joined at the hip" and "interlocking," because all the statements (and actions) were video recorded, there was no uncertainty about what defendant said or did. The jury would either find defendant meant what he said or find he was trying to protect his companions and earn street credibility by assuming liability for the shootings. Contrary to defendant's view, that calculus would not have changed if the more limited unwarned statements had been suppressed, as they should have been. Therefore, we can be sure that the verdicts were not attributable to the *Miranda* error.

The fair administration of justice demands that peace officers be trained in *Miranda* procedures and adhere to their training. The system did not function in several ways in this case. But the mistakes made did not prejudice defendant.

(ECF No. 13-3 at 12-21.)

////

////

21

1          **C. Discussion**

2          Petitioner makes three primary arguments regarding the admissibility of his post-<u>Miranda</u>

3    statements.  First, petitioner challenges the state court's holding that he voluntarily waived his

4    <u>Miranda</u> rights prior to giving the second confession.  He argues that the state court misconstrued

5    federal law by failing to consider whether when officers gave petitioner his <u>Miranda</u> warnings,

6    they took sufficient measures to cure any taint of petitioner's initial incriminating admissions.

7    Second, petitioner argues that the state court unreasonably found that officers did not deliberately

8    employ a two-step interrogation procedure.  Third, petitioner contends the trial court's improper

9    admission of his pre-<u>Miranda</u> statements was prejudicial.

10                    **1. Voluntariness of Miranda Waiver**

11         Petitioner argues that even if a two-step interrogation was not a deliberate attempt to

12   evade <u>Miranda</u>, the court must still consider whether or not curative steps were taken when

13   evaluating the voluntariness of a <u>Miranda</u> waiver.  Petitioner misreads the rule of <u>Seibert</u> that is

14   binding on this court.  The clearly established rule in <u>Seibert</u> is that "if officers deliberately

15   employ the two-step technique employed in *Seibert*, <u>and</u> if insufficient curative measures are

16   taken to ensure that later *Miranda* warnings are genuinely understood, any warned statement

17   thereby obtained must be suppressed even if the statement is voluntary."  <u>Reyes</u>, 833 F.3d at 1029

18   (emphasis added).  A two-step interrogation after <u>Seibert</u> renders a post-<u>Miranda</u> confession

19   inadmissible where:  (1) the interrogation technique is a deliberate strategy to avoid giving

20   <u>Miranda</u> warnings; and (2) the police fail to take sufficient curative measures.  Nothing in <u>Seibert</u>

21   or <u>Reyes</u> indicates that a second confession is not admissible if officers failed to take curative

22   measures, regardless of the deliberate nature of the two-step process.  Rather, once a court

23   determines the two-step process is not deliberate, then the court looks to the voluntariness

24   standards set out in <u>Elstad</u>.  <u>Seibert</u>, 542 U.S. at 622 (Kennedy, J., concurring in the judgment).

25         Petitioner cites no authority to support his interpretation of the <u>Seibert</u> rule and this court

26   is aware of none.  While petitioner contends that the Ninth Circuit in <u>Reyes</u> examined curative

27   measures, he fails to point out that the court only did so after determining officers deliberately

28   employed a two-step process.  See <u>Reyes</u>, 833 F.3d at 1030-33.  This court finds the fact the state

court did not consider curative measures was not contrary to or an unreasonable application of the clearly established federal law set out in Seibert.

Petitioner also argues that the state court unreasonably applied Elstad when it found he voluntarily waived his Miranda rights before he gave his second confession.  Petitioner contends his youth, intellectual and psychological limitations, and the intimidation resulting from being shackled and from the aggressive questioning leads to the conclusion that petitioner did not voluntarily waive his rights.[3]  The video of the interrogation shows petitioner appeared to understand his rights and hesitated only for a moment before agreeing to continue the interrogation.  "[A] suspect may impliedly waive the rights by answering an officer's questions after receiving Miranda warnings."  United States v. Rodriguez, 518 F.3d 1072, 1080 (9th Cir. 2008) (citation omitted); see also North Carolina v. Butler, 441 U.S. 369, 373 (1979) (A valid waiver of Miranda rights may be implied through "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.").  Petitioner fails to show that no reasonable jurist could agree with the state court's finding of voluntariness.

## 2.  Did Officers Deliberately Employ a Two-Step Interrogation Procedure?

The question for this court on habeas review is whether the state court's determination that the two-step interrogation was not a deliberate attempt to evade Miranda was so unreasonable that it is "beyond any possibility for fairminded disagreement."  Richter, 562 U.S. at 103.  For determinations of law, petitioner must show the Court of Appeal's decision was contrary to, or an unreasonable application of, clearly established federal law.  28 U.S.C. §2254(d)(1).  With respect to the Court of Appeal's determination of the facts, the federal court may only find it unreasonable where it is "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record."  Loher v. Thomas, 825 F.3d 1103, 1112 (9th Cir. 2016) (citing Hibbler v. Benedetti, 693 F.3d 1140, 1146 (9th Cir. 2012)); see also 28 U.S.C. §2254(d)(2).

---

[3] Petitioner also contends here that he lied to officers about stealing Elarm's purse, which shows that he was "taking the fall" for his co-defendants when he confessed.  It is not clear to this court how that argument – that petitioner's confession was unreliable - relates to the voluntariness of his Miranda waiver.  Petitioner cites not case law relating these two concepts.

1

### a. Unreasonable Application of Clearly Established Law

2       Petitioner argues the Court of Appeal unreasonably applied Seibert because it focused on

3   the lack of subjective evidence that the officers intended to evade Miranda.  As petitioner points

4   out, objective evidence of intent can be sufficient to prove officers acted deliberately.  Williams,

5   435 F.3d at 1158.  The court in Williams listed the following objective factors courts might

6   consider in determining whether an intentional two-step process was used:  "the timing, setting

7   and completeness of the prewarning interrogation, the continuity of police personnel and the

8   overlapping content of the pre-and postwarning statements."  Id. at 1159.

9       The Court of Appeal stated that it was reviewing the trial court's "finding that there was

10   no subjective plan to evade *Miranda*" for "substantial evidence."  (ECF No. 17-13 at 15-16.)  The

11   court held that "[t]he record, far from suggesting any deliberate protocol to undermine *Miranda*

12   guided the detectives, instead suggests they acted with little or no method at all."  (Id. at 17.)  The

13   court concluded that the trial court's "factual finding that no proscribed two-step technique was

14   employed in this case" was "supported by the evidence recounted *ante*."  (Id.)  In that prior

15   section, the court summarized the content of the video and described some of the testimony of

16   Detectives Meux and Kirby.  The court described both objective and subjective evidence and

17   stated that the record "suggests" the officers did not intentionally employ a two-step procedure.

18   Based on those statements this court cannot find the Court of Appeal unreasonably applied clearly

19   established federal law by only considering subjective evidence of the officers' intent.

20

### b. Unreasonable Determination of the Facts

21       This court has viewed the video of plaintiff's interrogations and read the transcript of the

22   evidence presented at the suppression hearing.  Both the video and the suppression hearing

23   evidence give this court pause about the state court's finding the officers did deliberately employ

24   a two-step interrogation.  Nonetheless, this court concludes that the Court of Appeals' decision

25   was not based on such an unreasonable determination of the facts that no "fairminded jurist could

26   reach [that] conclusion." Shinn v. Kayer, 141 S. Ct. 517, 524 (2020) (per curiam).

27   ////

28   ////

24

**(i)  Video of Interrogations**

This court agrees with petitioner that the objective evidence gleaned from the interrogation video could lead to the conclusion that at least one of the interviewing officers deliberately planned to try to obtain a confession before giving petitioner his <u>Miranda</u> warnings. The video shows the following.

Detective Meux entered the interview room almost an hour and a half after petitioner was taken there.  After he unshackled petitioner's leg and took petitioner to the bathroom, Meux first told petitioner that petitioner's name had come up in their investigation of a double homicide. (ECF No. 17-1 at 121.[4])  He then told petitioner he was not under arrest, told him he was free to go, and offered to find petitioner a ride home.  (<u>Id.</u>)  While the Court of Appeal stated that Meux told petitioner "he did not have to talk,[5]" Meux did not explicitly make that statement.  Rather, without waiting for any response from petitioner about getting a ride home, Meux told petitioner he just wanted to "figure out how to clear your name" and launched into a series of basic identification questions about, among other things, petitioner's age, parents, and school.    (<u>Id.</u> at 122, et seq.)

The questioning turned accusatory.  Meux asked where petitioner was the night of the murders and told him witnesses had identified someone at the scene who looked like petitioner. (ECF No. 17-1 at 141.)  Meux then told petitioner that the identification was "why we're talking, okay, so that's why it's very important that if you had nothing to do with this murder that you help us prove it wasn't you."  (<u>Id.</u>)

After about a half hour of questioning, Meux told petitioner he was leaving the room to find out what the others being questioned were telling officers.  Meux told petitioner he was leaving the door unlocked and repeated that petitioner was not under arrest.  (ECF No. 17-1 at 142.)

---

[4] This court cites to the transcript of the interrogations contained in the Clerk's Record.  The transcript does not reflect times.  The times identified herein are from this court's review of the videotape of the interrogations.

[5] ECF No. 17-13 at 7.

Detective Lonteen's follow-up questioning continued along the same vein.  Lonteen entered the interview room at 9:18 p.m., about thirty minutes after Meux left and over two hours after petitioner was taken to the interview room.  Lonteen made clear petitioner was not free to leave until officers downloaded information from petitioner's phone.  (ECF No.17-1 at 143.) Lonteen briefly left the room.  When he returned, he asked petitioner a few questions regarding where petitioner typically stayed and then began to intensely question petitioner.

Lonteen told petitioner "[a]nd we know something happened involving you guys. And trying to give you - this is your opportunity to tell us what your part in this whole thing was, okay? This thing . . . we don't know the full story.  We gotta - we gotta get it - hear from you. Okay?"  (ECF No. 17-1 at 164.)  Lonteen said he knew petitioner went out the night of the murders.  "I believe based on what we know and what we've found out that you and two other people left that apartment and walked down the street to another apartment complex."  (Id. at 176.)  "And a question to you is, again, keep in mind being truthful, is I believe based on what we found out that you were there at that apartment complex and involved in this incident. . . . we both know that you're not being truthful about that, okay?"  (Id. at 177.)  Immediately after that, at about 9:56 p.m., petitioner told Lonteen he shot the victims.  (Id. at 178.)  Lonteen asked follow-up questions and at about 10:03 p.m., petitioner asked for food and water.  Lonteen then appears to get a call or text message.  He told petitioner he would get him water and a snack and left the room.

Lonteen returned to the interview room about ten minutes later.  Petitioner asked Lonteen if he could make a phone call.  Lonteen put petitioner off, telling him "you will be able to make a phone call."  (ECF No. 17-1 at 186.)  Lonteen then told petitioner

> [W]hat I'm gonna do is, ah, I want to go kind of through the story and just make sure I understand everything that happened, because I don't want to get the wrong story. Okay, it's important for me to hear the right thing, it's important for you to tell me the right thing. Um, so what I'm gonna do, we're gonna kind of go back over from the beginning, okay? Are you·good with that? Okay. Ah, what I'm gonna do before that is I'm gonna read you your rights.

The following then took place:

////

26

1      ED:  I'm just - all right, all right.

2      LONTEEN:  Okay. All right. Ah, so Ezekiel, right?

3      ED:  Yeah:

4      LONTEEN:  I know you go by (Zeke), okay. You have the right to remain silent. Do you

5  understand that? Okay. Yes?

6      ED:  Yes sir.

7      LONTEEN:  Okay. Anything you say can be used against you in a court of law. Do you

8  understand that? Yes?

9      ED: Yes, sorry .

10     LONTEEN:  Thank you. I just need to hear you say it. Okay you have - you have the right

11 to talk to an attorney and have an attorney present before and during questioning. Do you

12 understand that?

13     ED:  Yes sir.

14     LONTEEN:  Okay. If you can't afford an attorney, one will be appointed free of charge to

15 represent you before and during questioning if you desire. Do you understand that?

16     ED:  Yes sir.

17     LONTEEN:  Okay. I'm gonna kind of go back over a lot of these things that we talked

18 about and make sure that again, I understand .the right story. Are you okay with that?

19     ED:  You say what?

20     LONTEEN:  Are you okay with doing that?

21     ED:  Going back?

22     LONTEEN: Just - just kind of going through again and making sure that I understand all

23 the story.

24     ED:  Yeah, yeah, yeah.

25 (ECF No. 17-1 at 186-87.)

26     Petitioner then repeated the story he told earlier, with additional detail.

27 ////

28 ////

27

1

      **(ii)  Suppression Hearing[6]**

2

      **(a)  Testimony of Detective Meux**

3
      Detective Meux testified as follows.  Officers' review of victim Cannon's phone showed

4
contact with Elose Brown's phone regarding a purchase of marijuana.   However, Cannon's

5
phone showed a contact name for that phone number as "WK Lynch."  (ECF No. 17-3 at 37-39.)

6
Research on social media showed that Jason Lynch and petitioner were associates of Brown.  (Id.

7
at 41.)  Kirby later testified that they knew Brown and petitioner had previously been arrested

8
together.  (Id. at 128.)

9
      On April 11, officers executed a search warrant at Brown's home.  There, they found

10
Cober, petitioner, Brown, and some members of Brown's family.  (ECF No. 17-3 at 41.)  Initially,

11
officers spoke to Brown, with Brown's mother present.  According to Meux, officers did not, at

12
that time, consider petitioner to have been involved.  (Id. at 44-45.)

13
      Meux testified that petitioner was not a "primary suspect."  "At best, he was potentially a

14
witness who might have some knowledge about Elose [Brown] or Mr. Lynch's involvement."

15
(ECF No. 17-3 at 46.)  When asked whether petitioner might have matched the physical

16
description from some of the eyewitness descriptions of people seen running from the car," Meux

17
stated that the description was "[o]nly that the witnesses described potentially a light-skinned or

18
light-skinned people running from the scene. Beyond that, there wasn't a very descriptive

19
description that was given about height or weight or anything like that."  (Id. at 46-47.)

20
      When he questioned petitioner about his whereabouts, Meux thought petitioner was lying

21
because Cober told officers that petitioner had gone to a house in south Sacramento that night.

22
(ECF No. 17-3 at 49.)  Meux later testified that Cober said petitioner had gone to "the complex"

23
that night.  (Id. at 66.)

24
      Meux left the interview room to talk with Lynch.  He asked Lonteen to speak with

25
petitioner because he thought Lonteen might have additional information based on interviews

26
with others.  (ECF No. 17-3 at 53.)  On his way to see Lynch, Meux got a call from Kirby that

27

---

28
[6] The transcript of the suppression hearing is contained in the Record of Transcript.  It begins at p. 35 of ECF No. 17-3.

petitioner had confessed.  He was "surprised" and told Kirby he had not <u>Mirandized</u> petitioner.  (<u>Id.</u> at 55.)

Meux testified that he knew officers had taken a witness's statement identifying a "light-skinned person" running out of the gate after the shooting.  (ECF No. 17-3 at 58-59.)  He agreed that Brown, Lynch, and Cober are African American and that petitioner is a "very light-skinned Hispanic."  (<u>Id.</u> at 58, 69.)  Meux confirmed that during the interview, he told petitioner a witness had identified someone who looked like petitioner running from the scene.  (<u>Id.</u> at 67.)  He went on to state:  "I believed that Mr. Delgado was present there because of the descriptions of people running and the number of people that were running."  But, he did not recall any indication that petitioner "was the person involved in the shooting."  (<u>Id.</u> at 67-68.)  When Meux was asked whether at that time he interviewed petitioner he knew a robbery had also been committed, Meux testified that he knew a purse had been taken.  (<u>Id.</u> at 68.)

Meux then contradicted himself.  He testified that petitioner was not a suspect because "we didn't have any evidence pointing to him.  We didn't have anybody putting him there." (ECF No. 17-3 at 69.)

### (b)  Testimony of Detective Lonteen

Lonteen testified that when he entered the interview room, he knew petitioner was a minor.  He did not know whether petitioner had been given any admonitions.  However, it can be inferred that Lonteen did not think petitioner had been <u>Mirandized</u> because he agreed with petitioner that petitioner was free to leave and testified that "we had not discussed even the potential of arresting him at that point. He was a witness as far as we knew."  (ECF No. 17-3 at 100-101.)  Lonteen also testified that he believed petitioner was not in custody when Lonteen entered the interview room.  (<u>Id.</u> at 111.)

Lonteen recalled that on April 10, the day of the crimes and the day before petitioner was interviewed, officers had information that "light-skin Hispanics, two or three, were seen running from the scene of the crime."  He testified that he did not, however, recall the witness statement that "one of them was a white male with short brown hair wearing a white T-shirt."  (ECF No. 17-3 at 104.)  But, he did recall that he knew before interviewing petitioner "one person saying that it

was light-skinned Hispanics.  One said possibly a white male."  He did not recall that the witness identified the white male as possibly the shooter.  (Id. at 105.)  Lonteen also testified that he knew Brown and Lynch are Black.  (Id. at 107.)

Lonteen thought petitioner might have been with Brown that night and was "involved" in the crimes.  But, "[t]o what degree, I had no idea."  (ECF No. 17-3 at 110-11.)

Lonteen agreed that his questioning of petitioner after giving him the Miranda warnings was essentially a continuation of previous questioning.  (ECF No. 17-3 at 113.)

### (c)  Testimony of Detective Kirby

Detective Kirby confirmed that she had taken a statement from a witness who told Kirby she saw people running from the scene and "'[o]ne of them was a white male with short brown hair wearing a white T-shirt. Something about the way he was moving makes me think he was the one that shot.'"  (ECF No. 17-3 at 125.)  Kirby testified that she "recall[ed] definitely sharing [that information] with Detective Lonteen."  (Id. at 126.)  She did not recall sharing the information with Meux, but testified that it was "likely that I would."  (Id.)  Kirby testified that she did not consider petitioner a suspect when he was taken in for questioning.  (Id. at 130.)  She did not observe Meux's interview of petitioner and just saw a little of Lonteen's interview before petitioner confessed.  (Id.)

### (iii)  Trial Court Decision on Suppression Motion[7]

As stated above, this court considers the decision of the Court of Appeal when conducting review under 28 U.S.C. §2254(d).  The Court of Appeal stated that the trial court's determination that no two-step procedure was intentionally used was supported by the evidence set out in its own decision.  While this court takes that statement at face value - that the Court of Appeal relied on the facts it described - this court has reviewed the trial court's decision, and in particular its findings of fact, to assure that all evidence before the Court of Appeal is considered herein. Below this court cites relevant portions of the trial court's decision.

////

---

[7] The trial court's written decision can be found in the Clerk's Transcript starting at p. 282 in ECF No. 17-1.

1

2   Neither Detectives Meux, Lonteen nor Kirby observed defendant Delgado leaving the Sumatra Drive residence. None of those detectives were aware that Delgado had been arrested, placed in handcuffs for transportation to the sheriff's station, or that Delgado was held in an interview room at the station for approximately 84 minutes, shackled to the floor or table, before Detective Meux entered the room to interview Delgado.

3

4

5   At the time, neither Detective Meux, nor Lonteen, nor Kirby considered Delgado to be a suspect in the murder. All of them considered Delgado to be a possible material percipient witness to the shooting. Their primary suspects for the shooting at the time that Meux began his interview of Delgado were Elose Brown and Jason Lynch.

6

7

8

9   (ECF No. 17-1 at 285.)

10   Meux immediately removed the shackles, took Delgado to the bathroom, and upon their return told Delgado that he was not under arrest, and was free to go at any time. Meux left the door to the interview room open, and pointed out to Delgado that he was leaving it open because Delgado was free to leave at any time. The videotape of Detective Meux interview of Delgado demonstrates what seems to be genuine surprise to find out that Delgado had been shackled in the interview room.

11

12

13

14

15   (ECF No. 17-1 at 286.)

16   Meux's "focus was upon Delgado as someone who might have seen something that

17   happened on Howe Avenue, as opposed to being the person who did something on Howe

18   Avenue."  (ECF No. 17-1 at 287.)

19   Detective Lonteen testified that he did not see defendant Delgado leave the Sumatra Drive location, did not see him enter the Sheriff's substation, had not spoken to Detectives French and Roberts, and knew nothing about Delgado's custody status. Detective Lonteen knew that Detective Meux thought that Delgado was not being truthful about his whereabouts on the day leading up to the shooting. Meux had asked Lonteen to see if he could get any additional information about this from Delgado.

20

21

22

23

24   (ECF No. 17-1 at 287.)

25   When Lonteen entered the interview room with defendant Delgado, he introduced himself and asked Delgado for the access code for his cell phone so he could do a "dump" of its contents. Delgado asked Lonteen how long he would be there, pointing out that the other detective "told me that I am not under arrest or anything." Lonteen advised Delgado that they were trying to make it not much longer. At the time, Lonteen was of the opinion that Delgado was not in

26

27

28

31

1   custody, and he had no reason at that time to believe that Delgado
    would not be going home shortly.

2

3   (ECF No. 17-1 at 287-88.)

4       The trial court summarized the facts occurring after petitioner first confessed to Lonteen:

5           For the next several moments, Detective Lonteen discussed the
            details of what Delgado was saying with him. [Tr. pp. 62- 70: 6].
6           Detective Kirby was observing Detective Lonteen's interview of
            Delgado through a one way mirror in an adjacent room. She was
7           shocked when she heard Delgado admit to the murder, as Elose
            Brown and Jason Lynch still were their primary suspects as being the
8           shooter and accomplice. Detective Lynch immediately called
            Detective Meux, who had left to interview Jason Lynch.

9
            Meux was just pulling into the parking lot of Lynch's place of
10          employment when he received the call from Kirby. At the time he
            received the call, he was of the belief that Lynch was the shooter.
11          Meux told Kirby that Delgado never had been read his Miranda
            rights, and that Lonteen should do that immediately. Kirby then
12          either called or texted Lonteen to come out of the interview and
            confer with her. She told Lonteen that Delgado's Miranda rights had
13          to be read to him. Lonteen went back into the interview with
            defendant Delgado and read him his Miranda rights.

14

15  (ECF No. 17-1 at 289.)

16  The trial court's relevant findings were:

17          I find that the evidence establishes that Meux was genuinely
            surprised to find that Delgado was shackled to the floor or table.
18          Meux did not participate in Delgado being placed into custody, did
            not see Delgado leave the Sumatra Drive address or arrive at the
19          Sheriffs substation, or have any other reason to believe that Delgado
            was in custody.
20
            I find that Meux immediately released defendant Delgado from
21          custody upon making the discovery that he had been restrained. He
            told Delgado that he was not under arrest; he told Delgado that he
22          was free to leave any time; he told Delgado that he would give him
            a ride home or wherever he wanted to go; and Meux left the door to
23          the interview room not only unlocked, but also wide open.

24  (ECF No. 17-1 at 292-93.)

25          I find that Detective Meux's statements to Delgado about not being
            under arrest and free to leave were not a subterfuge to conduct an
26          interview of a suspect by tricking him into thinking that he was free
            to go, and therefore not be subject to a custodial interrogation. All
27
    ////
28

three detectives testified that Delgado was not a suspect in the shooting right up to the point where he confessed.

(ECF No. 17-1 at 294.)

The fact that detectives Meux and Lonteen suspected that Delgado was lying about his whereabouts on the evening of April 9th does not mean that they believed that he possibly was the shooter who killed Cannon and Elarms. All it means is that they suspected that Delgado had information about what had happened on April 9th and 10th, and was attempting convince the detectives that he had no information to impart. That doesn't mean that Delgado was a suspect, and it doesn't mean that he was in custody.

(ECF No. 17-1 at 295.)

I find that a reasonable juvenile, aged 16 years and 11 months, who had prior experience with the juvenile justice system, would have known that he was not under arrest during Detective Meux's interrogation and the beginning of Detective Lonteen's interrogation, and was free to leave at any time.

(ECF No. 17-1 at 297.)

Here there is no evidence that either the Sacramento County Sheriffs Department, or the Homicide Bureau or even this specific team of detectives had any policy or protocol to not advise persons subject to custodial interrogations of their Miranda rights [trial court is distinguishing Seibert here]. To the contrary, the evidentiary hearing demonstrated that the detectives here were very conscious to distinguish between potential witnesses who were not in custody and suspects who were the subject of custodial interrogations.

All three detectives testified that they did not consider defendant Delgado to be a suspect based upon what they knew at the time. All three detectives testified that they considered the primary suspects to be Elose Brown and Jason Lynch. All three detectives testified that they considered Delgado to be a potential witness because they thought that Delgado may have been in the vicinity of the shooting, or maybe was told something about the shooting by Brown.

Viewing the facts known to the detectives at the time strongly suggests that the most reasonable conclusion was that Brown and Lynch were the likely shooters, and Delgado was at best a possible witness. Both detectives who came in contact with Delgado at the Sheriff's station told him that he was not under arrest and that he was free to leave.

All three detectives made clear the distinctions between the handling of witnesses who are not in custody when being interviewed, and suspects who are in custody when they are being interrogated. All three detectives made clear that Delgado was not provided with Miranda rights because he was not in custody, and he was not

33

1        considered a suspect. All three detectives made clear that non-
2        suspect potential witnesses specifically are told that they are not
       under arrest and are free to go. All three detectives referred to this
3        advice as the "Beheler admonition." On the other hand, suspects who
       are being interrogated and who are not free to leave are given their
4        Miranda rights.

5        The detectives demonstrated this distinction on April 11, 2014, when
       they repeatedly gave Delgado the "Beheler admonition," i.e., that he
6        was not under arrest and that he was free to go, up until his status
       changed from potential witness to suspect, at which time he was
7        given his Miranda warnings. I find that the detectives' treatment of
       defendant Delgado was not a subterfuge designed to "lull" him into
8        an unadvised confession.

9 (ECF No. 17-1 at 300-01.)

10        Detective Kirby was observing the interview in "real time" from the
       adjacent room, and immediately contacted Detective Meux to advise
11        him that Delgado had confessed. Detective Meux advised Detective
       Kirby that Miranda warnings had not been given, but had to be given
12        at that time. Detective Kirby immediately contacted Detective
       Lonteen to suspend the interview and come out for a conference.
13        During that conference, Detective Lonteen was advised to administer
       the Miranda warnings, which he did immediately upon returning to
14        the interview with Delgado.

15 (ECF No. 17-1 at 302.)

16              **(iv)  Did the Court of Appeal Unreasonably Determine the**

17                           **Facts?**

18      In <u>Williams</u>, the Ninth Circuit listed the following objective factors courts might consider

19 in determining whether an intentional two-step process was used:  "the timing, setting and

20 completeness of the prewarning interrogation, the continuity of police personnel and the

21 overlapping content of the pre-and postwarning statements."  <u>Williams</u>, 435 F.3d at 1159.  In

22 <u>Reyes</u>, the Ninth Circuit found police conduct was a deliberate attempt to evade <u>Miranda</u> where

23 the interrogations were "'systematic, exhaustive, and managed with psychological skill.'"  <u>Reyes</u>,

24 833 F.3d at 1031 (quoting <u>Seibert</u>, 542 U.S. at 616).

25      This court agrees with the Court of Appeal that petitioner's transportation to the police

26 station, shackling, and initial isolation for almost an hour and a half do not, from the objective

27 evidence, appear to have been part of a plan to convince petitioner to incriminate himself.  As the

28 trial court pointed out, the video shows that Meux seemed surprised petitioner had been shackled.

34

However, many aspects of the conduct of Meux, and particularly of the conduct of Lonteen, after that point could be considered indicative of such a plan.

Both Meux and Lonteen were experienced detectives.  The setting for the interrogations was a small, stark room at the police station.  Both officers indicated they knew petitioner was a minor.  While Meux told petitioner he was free to leave, he did not give petitioner a chance to respond to that statement before launching into a series of questions.  At first, those questions were nonthreatening.  Meux asked petitioner for identifying and background information.  However, Meux quickly turned to a series of pointed questions during which he told petitioner he thought he was involved in the crimes and accused petitioner of lying.

Shortly after Meux left, Lonteen began questioning petitioner.  Again, the questions were pointed and accusatory.  When petitioner did incriminate himself, Lonteen continued questioning him for several minutes.  Lonteen then left for a brief period of time – only about ten minutes.  When he returned, he did not immediately give petitioner the Miranda warnings.  Rather, Lonteen first made it clear that he wanted to go back over petitioner's incriminating statements "from the beginning" and asked petitioner if he was okay with that.  Lonteen then gave petitioner the Miranda warnings.  While petitioner said he understood each one, Lonteen did not seek a waiver from petitioner before beginning his questioning.

Whether or not Meux and Lonteen considered petitioner the shooter, their questions and behavior certainly indicated they thought he was involved.  Involvement in even the drug purchase or the robbery would have been criminal.  Meux and Lonteen's conduct could reasonably be considered an attempt to get information from petitioner about the shooting generally and a confession from petitioner about his involvement.

The evidence presented at the suppression hearing also provides some support for petitioner's position.  While Meux and Lonteen testified at the suppression hearing that they did not consider petitioner a suspect, and therefore did not feel Miranda warnings were necessary, evidence was presented at the suppression hearing that puts that testimony in doubt.

First, there was evidence that both Meux and Lonteen knew that a witness told police she saw a light-skinned Hispanic, with short hair running from the scene and that she felt he could be

35

the shooter.  Detective Kirby testified that she had taken the witness's statement and recalled telling Detective Lonteen.  She testified she likely told Detective Meux.  Lonteen testified that he recalled knowing that a witness had identified a light-skinned Hispanic before questioning petitioner but did not recall that the witness felt that person might be the shooter.  Both Lonteen and Meux knew that Brown and Lynch, the two people they repeatedly stated were the suspects in the shooting, were African American.  There was no testimony at the suppression hearing that any witnesses saw African Americans at the scene or running from the scene.  Given these facts, it is hard to believe that the officers did not consider petitioner a suspect, despite their testimony to the contrary.

Second, the officers' testimony at the suppression hearing regarding whether or not they considered petitioner a suspect was at times lacking in substance and at times contradictory.  While Meux, Lonteen, and Kirby all testified that Brown and Lynch were the suspects in the shooting, they never explained why that was so.  The officers knew Brown and Lynch were likely involved in the planned drug transaction based on the phone records.  But, both Meux and Lonteen testified that they felt petitioner was lying about his whereabouts.  Meux specifically testified that he believed petitioner was at the scene.  During the interrogation, Lonteen told petitioner, "I believe you were at the apartment complex and involved in this incident."  At the suppression hearing, Lonteen attempted to explain why that statement did not necessarily mean he considered petitioner a suspect –

> "Involved" could be there, but a witness -- and I don't know to what level of participation. Those things are really unknown at that point; but being present, in my mind, I consider being involved if they have intimate knowledge of what happened but not necessarily maybe a actor in the event itself.

(ECF No. 17-3 at 109.)  Based on this court's review of the video of petitioner's questioning, this court finds Lonteen's suppression hearing testimony that he did not consider petitioner a suspect appears disingenuous.

Further, the officers' testimony on this point was not particularly consistent.  As set out above, Meux testified that petitioner was not a "primary" suspect but then stated that "[a]t best, he was potentially a witness."  After confirming that he knew a witness identified someone who

36

1    looked like petitioner running from the scene, Meux testified that he believed petitioner was

2    present at the scene but did not think petitioner was the shooter.  He immediately limited that

3    statement by stating that there was no evidence putting petitioner at the scene.

4         Third, the officers did not explain why petitioner was not a suspect in a crime other than

5    murder.  If officers felt petitioner was at the scene, they did not explain why petitioner could not

6    have been considered an accomplice to the murders, or a participant in the intended drug

7    transaction, or the perpetrator of or accomplice to the robbery of Elarms' purse.  While those

8    were not the primary crimes officers were concerned about, they are nonetheless crimes.

9         The state courts did not explicitly consider much of this evidence.  The Court of Appeal

10   spent little time discussing whether officers intentionally employed a two-step procedure.  The

11   court simply concluded that "[t]he trial court made a factual finding that no proscribed two-step

12   technique was employed in this case, and that finding is supported by the evidence recounted

13   *ante*."  The court also stated that <u>Seibert</u> requires "a finding of a deliberate intent and plan to

14   circumvent *Miranda*. We uphold the trial court's finding there was no such intention.  [¶]  The

15   record, far from suggesting any deliberate protocol to undermine *Miranda* guided the detectives,

16   instead suggests they acted with little or no method at all."  The appellate court did not

17   independently analyze the facts presented at the suppression hearing.

18        Neither court explicitly examined the officers' credibility at the suppression hearing that

19   they did not consider petitioner a suspect in the murder.  Though, it is clear the trial court found

20   the officers credible.  The state courts did not expressly consider the officers' knowledge of the

21   witness's statement that she saw a light-skinned Hispanic, with short hair running from the scene

22   and that she felt he could be the shooter.  The trial court stated that "[v]iewing the facts known to

23   the detectives at the time strongly suggests that the most reasonable conclusion was that Brown

24   and Lynch were the likely shooters, and Delgado was at best a possible witness."  (ECF No. 17-1

25   at 300.)  The trial court did not, however, explain just what those facts were.

26        Neither court explicitly considered the contradictions and lack of substance in the officers'

27   testimony.  Nor did those courts explicitly consider the possibility that officers could have

28   suspected petitioner of a crime besides murder.  The trial court held that the fact Meux and

1  Lonteen suspected petitioner was lying about his whereabouts did "not mean that they believed he

2  was possibly the shooter."  (ECF No. 17-1 at 295.)  The trial court did not consider whether the

3  detectives might have suspected petitioner of lesser crimes.

4          In addition to the apparent failure to consider important issues with respect to the officers'

5  credibility, the state courts limited their decisions to looking at the conduct of all officers when

6  considering whether there was an intent to evade Miranda.  This issue could have been limited to

7  consideration of Lonteen's behavior.

8          The Court of Appeal found that petitioner was in custody for purposes of Miranda when

9  Lonteen told petitioner he could only leave after officers searched his phone.  Even though the

10 court found a clear distinction between petitioner's custody status during Meux's questioning and

11 his status during Lonteen's questioning, the Court of Appeal did not consider whether a plan to

12 evade Miranda could have originated with Lonteen and been carried out solely by him.  The court

13 instead focused on all of the events leading up to petitioner's confession.  There is no reason that,

14 under Siebert, the court should have been so limited in its analysis.  Seibert does not require a

15 court to examine the question of intent from the moment the defendant is contacted by the police

16 to the moment he confesses.  Lonteen walked into the interview room knowing a witness had

17 identified a light-skinned person running from the scene and immediately placed petitioner in

18 custody by refusing to allow petitioner to leave when petitioner asked to do so.  Lonteen did not

19 testify that he thought petitioner had been Mirandized at that point.  Rather, he testified that he

20 did not know.  Lonteen then jumped into intensive questioning to get petitioner to tell him the

21 "whole story."  On the record before this court, it is hard to credit the officers', and particularly

22 Lonteen's, testimony that petitioner was not a suspect in at least some aspect of the crimes.

23         As stated in the prior section, the Court of Appeal's decision indicates the court looked to

24 the objective evidence from the video and some parts of the suppression hearing to uphold the

25 trial court's determination that there was no plan to evade Miranda.  It's worth noting that, to the

26 extent the Court of Appeal relied on the trial court's findings, the trial court specifically found

27 only that the officers' testimony showed no "policy" to evade Miranda by using a two-step

28 interrogation process.  Seibert does not require proof of a departmental policy to use a two-step

1  interrogation procedure.  Rather, the question is whether the officers deliberately did so.  Seibert,

2  542 U.S. at 621-22 (Kennedy, J., concurring in the judgment).

3          While this court is troubled by the state courts' findings, federal court review is extremely

4  limited:

5          Regardless of the type of challenge, "[t]he question under AEDPA is
           not whether a federal court believes the state court's determination
6          was incorrect but whether that determination was unreasonable—a
           substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465,
7          473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007). Thus, if a petitioner
           challenges the substance of the state court's findings, "it is not
8          enough that we would reverse in similar circumstances if this were
           an appeal from a district court decision." *Taylor*, 366 F.3d at 1000.
9          "Rather, we must be convinced that an appellate panel, applying the
           normal standards of appellate review, could not reasonably conclude
10         that the finding is supported by the record." *Id.*

11  Hibbler, 693 F.3d at 1146.  The normal standard of appellate review, as described by the Court of

12  Appeal in this case, is whether the trial court's decision was supported by substantial evidence.

13  (ECF No. 17-13 at 15-16.)  Thus, federal court review is "doubly deferential."  "Because the

14  federal court defers to the state reviewing court's determination of the facts, and the reviewing

15  court defers to the trial court's determination of [a witness's] credibility. This doubly deferential

16  standard means that 'unless the state appellate court was objectively unreasonable in concluding

17  that a trial court's credibility determination was supported by substantial evidence, we must

18  uphold it.'"  Sifuentes v. Brazelton, 825 F.3d 506, 517-18 (9th Cir. 2016) (quoting Briggs v.

19  Grounds, 682 F.3d 1165, 1170 (2012)); see also Rice v. Collins, 546 U.S. 333, 341-42 (2006)

20  (that reasonable minds might disagree about a factual finding "does not suffice to supersede the

21  trial court's credibility determination" on habeas review).

22          The federal court may not substitute its judgment for that of the state court.  The question

23  is whether "'a fairminded jurist could reach a different conclusion.'"  Oliver v. Davis, 25 F.4th

24  1228, 1236 (9th Cir. 2022) (quoting Shinn, 141 S. Ct. at 524).  With these standards in mind, the

25  United States Supreme Court has, in some circumstances, refused to defer to a state court factual

26  finding.  In Miller-El v. Cockrell, 537 U.S. 322, 347 (2003), the Court examined a state court's

27  ////

28  ////

1   resolution of a Batson claim.[8]   The Court noted that the state courts "made no mention" of

2   evidence showing prosecutors asked the trial court to "shuffle" the potential jurors only when the

3   next jurors to be questioned were African American and evidence of the district attorney's

4   historical record of purposeful discrimination. While the Court "adhere[d] to the proposition that

5   a state court need not make detailed findings addressing all the evidence before it," it found the

6   state court's failure to consider the evidence "does not diminish its significance."  The Court

7   found, in light of that evidence, that the state court's finding that the defendant had not made a

8   prima facie showing of discrimination was "clear error."  Miller-El, 537 U.S. at 347.

9           As set out above, this court's concerns about the state court credibility determination

10   revolve around the state court's failure to explicitly state it had considered evidence that might

11   put the officers' credibility in question.  However, "a state court's written opinion is not required

12   to mention every relevant fact or argument in order for AEDPA deference to apply."  Lee v.

13   Comm'r, Alabama Dep't of Corr., 726 F.3d 1172, 1223 (11th Cir. 2013); Miller-El, 537 U.S. at

14   347; cf. Harrington v. Richter, 562 U.S. 86, 98 (2011) ("The statute refers only to a 'decision,'

15   which resulted from an 'adjudication' . . . determining whether a state court's decision resulted

16   from an unreasonable legal or factual conclusion does not require that there be an opinion from

17   the state court explaining the state court's reasoning."); Johnson v. Williams, 568 U.S. 289 (2013)

18   (same reasoning applies where state court opinion decides some, but not all, claims explicitly).

19          In the present case, the trial court ruled on the credibility of the officer witnesses after

20   holding an evidentiary hearing and giving petitioner the opportunity to develop the record.

21   "Absent clear and convincing evidence" to the contrary, this court "must defer to the trial court's

22   credibility determination."  Rhodes v. Roe, 61 F. App'x 380 (9th Cir. 2003) (citing 28 U.S.C. §

23   2254(e)(1)); see also Mann v. Ryan, 828 F.3d 1143, 1153 (9th Cir. 2016) ("Our review of the

24   state habeas court's credibility determinations is highly deferential."); Davis v. Ayala, 576 U.S.

25   ─────────────
     [8] The Court in Miller-El did not rule directly on the merits of the petitioner's case.  Rather, the
26   Court considered whether the Court of Appeals erred when it refused to grant the petitioner a
     certificate of appealability ("COA").  The standard for granting a COA is whether "a petitioner
27   has made a substantial showing of the denial of a constitutional right."  Miller-El, 537 U.S. at 336
     (internal quotation marks and citations omitted).  Nonetheless, the Supreme Court in Miller-El
28   was clear that the state court's failure to consider certain evidence was error.

1    257, 271 (2015) ("State-court factual findings, moreover, are presumed correct; the petitioner has

2    the burden of rebutting the presumption by 'clear and convincing evidence.'" (citing Rice v.

3    Collins, 546 U.S. 333, 338-39 (2006).).

4        The officers testified they did not believe petitioner was a suspect and their intensive

5    questioning was designed to get information he may have learned as a witness or from the

6    perpetrators after the crimes.  The video does show some confusion on the part of the officers

7    involved, starting with the arrest based on a non-existent warrant.  And, the officers testified that

8    they were surprised when petitioner confessed to the murders.

9        "Although the record contained evidence supporting [petitioner's] assertions," the Court

10    of Appeal could have "reasonably determined that substantial evidence supported the trial court's

11    credibility findings" and conclusions.  Reno v. Davis, 46 F.4th 821, 837 (9th Cir. 2022) (citing

12    Schriro v. Landrigan, 550 U.S. 465, 473 (2007)).  Given the strict standards for federal review

13    under 28 U.S.C. §2254(d), this court concludes that petitioner fails to show the Court of Appeal's

14    decision was based on an unreasonable interpretation of the facts.

15                    **3. Prejudice from Admission of First Confession**

16        Petitioner's final argument on his Miranda claim is that admission of the first confession

17    was so prejudicial that he was deprived of due process.  The erroneous admission of petitioner's

18    first confession is subject to the harmless error analysis.  Neder v. United States, 527 U.S. 1, 18

19    (1999); Ghent v. Woodford, 279 F.3d 1121, 1126 (9th Cir. 2002).  In reviewing the prejudicial

20    effect of the erroneous admission of petitioner's first confession in a habeas case, the question is

21    whether the erroneously admitted evidence had a "substantial and injurious effect or influence in

22    determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Bains

23    v. Cambra, 204 F.3d 964, 977 (9th Cir. 2000).

24        The Court of Appeals found the Miranda error did not prejudice petitioner.  It held that

25    petitioner's "warned statements fully encompassed his unwarned statements, were more detailed,

26    and included his spontaneous and vivid reenactment of the crimes."  Further, there was nothing in

27    the unwarned statement that was not repeated during the warned statement.  (ECF No. 17-3 at

28    12.)

This court agrees that petitioner fails to show prejudice.  Because petitioner's second, admissible, confession told the same story with additional detail, admission of the first confession would not have had a substantial and injurious effect or influence on the jury's verdict.

In sum, the decisions of the Court of Appeal that officers did not engage in a two-step interrogation procedure, that petitioner's waiver of his <u>Miranda</u> rights was voluntary, and that petitioner was not prejudiced by admission of the first confession are not contrary to or an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts.  This court recommends petitioner's <u>Miranda</u> claim be denied.

**II.  Unlawful Arrest**

Petitioner argues his arrest and detention were unlawful and the trial court violated his Fourth Amendment rights when it denied his motion to suppress his statements to police.  Respondent counters that Fourth Amendment claims are barred from federal habeas relief pursuant to <u>Stone v. Powell</u>, 428 U.S. 465 (1976).

The Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  <u>Stone</u>, 428 U.S. at 494; <u>see</u> <u>Newman v. Wengler</u>, 790 F.3d 876, 881 (9th Cir. 2015) (holding <u>Stone</u> survived enactment of AEDPA).  "The relevant inquiry is whether petitioner had the opportunity to litigate his claim, not whether he did, in fact, do so, or even whether the claim was correctly decided."  <u>Ortiz-Sandoval v. Gomez</u>, 81 F.3d 891, 899 (9th Cir. 1996) (citations omitted).

In the instant case, petitioner moved the trial court to suppress his statements to police.  (ECF No. 17-1 at 67.)  While petitioner's written motion addressed only his <u>Miranda</u> claim, petitioner raised the Fourth Amendment claim in argument on his motion.  (<u>See</u> ECF No. 17-3 at 150, et seq.)  As explained in more detail above, after a hearing on the matter, during which petitioner was allowed to examine witnesses, the judge orally denied the motion on both the <u>Miranda</u> and Fourth Amendment grounds.  (ECF No. 17-3 at 35-180.)  The judge also issued a written decision.  (ECF No. 17-1 at 285-302.)  Petitioner raised the Fourth Amendment claim on

1   appeal.  The Court of Appeal issued a reasoned decision denying that claim on its merits.   (ECF

2   No. 13-3 at 12-14.)

3          In response to respondent's argument under Stone, petitioner simply states in the traverse

4   that he "rests on the arguments made in the petition."  (ECF No. 32 at 43.)  Petitioner does not

5   attempt to argue that Stone is inapplicable or that his Fourth Amendment claim was not fully and

6   fairly litigated in the state courts.  This court's review of the record shows that the state courts

7   provided petitioner with a "full and fair opportunity to litigate" his Fourth Amendment claim.

8   See Stone, 428 U.S. at 494; Moormann v. Schriro, 426 F.3d 1044, 1053 (9th Cir. 2005); Abell v.

9   Raines, 640 F.2d 1085, 1088 (9th Cir. 1981).  Accordingly, petitioner's Fourth Amendment

10  claims should be denied.

### III.  Insufficient Evidence of Premeditation and Deliberation

12         Petitioner argues there was insufficient evidence to support the findings of premeditation

13  and deliberation necessary to a first-degree murder conviction.  He further argues there is

14  insufficient evidence of an intent to commit robbery to support a felony murder conviction.

### A.  Legal Standards

16         The United States Supreme Court has held that when reviewing a sufficiency of the

17  evidence claim, a court must determine whether, viewing the evidence and the inferences to be

18  drawn from it in the light most favorable to the prosecution, any rational trier of fact could find

19  the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,

20  319 (1979).  "A reviewing court may set aside the jury's verdict on the ground of insufficient

21  evidence only if no rational trier of fact could have agreed with the jury."  Cavazos v. Smith, 565

22  U.S. 1, 2 (2011) (per curiam).  Moreover, "a federal court may not overturn a state court decision

23  rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with

24  the state court.  The federal court instead may do so only if the state court decision was

25  'objectively unreasonable.'"  Id. (citing Renico v. Lett, 559 U.S. 766 (2010)).  The Supreme

26  Court cautioned that "[b]ecause rational people can sometimes disagree, the inevitable

27  consequence of this settled law is that judges will sometimes encounter convictions that they

28  believe to be mistaken, but that they must nonetheless uphold."  Id.

**B. Decision of the State Court**

*Substantial Evidence of Murder*

Defendant contends no substantial evidence supports the murder convictions. We disagree with this view of the trial evidence.

Much of defendant's briefing reweighs evidence or chooses between competing inferences, but we must " 'review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Abilez* (2007) 41 Cal.4th 472, 504.) Under this standard of review, defendant's contentions fail.

*A. Premeditated and Deliberate Murder*

" 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citations.]' [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

Our Supreme Court has established guidelines for our review, as follows:

> "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing-what may be characterized as 'planning' activity; (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).

> "Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in

44

conjunction with either (1) or (3)." (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27.)

The above passage established "guidelines to aid reviewing courts in analyzing the sufficiency of the evidence to sustain findings of premeditation and deliberation." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.) "The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive." (Ibid.) Or as we have said before, the factors are not "a straightjacket on the manner in which premeditation can be proven adequately at trial." (*People v. Gunder* (2007) 151 Cal.App.4th 412, 420.)

Here, there is evidence of all three of the *Anderson* guideline factors.

There was evidence of planning because defendant went to what was purportedly expected to be a peaceful and petty drug transaction while armed with a concealed pistol. (Cf. *People v. Sanchez* (1995) 12 Cal.4th 1, 34 [retrieving knife from kitchen as planning activity]; *People v. Wharton* (1991) 53 Cal.3d 522, 547 [bringing hammer from garage as planning activity].) He then placed himself outside Cannon's car and behind the seated victims. He then shot them multiple times from behind. The jury could infer from defendant's course of conduct that he planned the killings from the beginning. It was not required to believe his story that he thought Cannon was reaching for a weapon and that he shot the seller to protect himself or protect Brown.

There was evidence of motives to kill each of the victims. The jury could find defendant's plan was to take whatever he could from Cannon, which is why defendant brought the loaded gun in the first place. The jury could also accept as true defendant's statement that he shot Elarms to eliminate a witness.

The manner of the killings also suggested premeditation and deliberation. Defendant shot Cannon several times, then shot his companion to eliminate her as a witness, then returned his attention to Cannon and emptied his pistol into him. Thus, the jury could rationally find that there were two clear intervals in which defendant could have reflected on the consequences of his actions. (*See People v. Stitely* (2005) 35 Cal.4th 514, 544 ["ample opportunity to consider the deadly consequences of his actions"]; *People v. Perez, supra*, 2 Cal.4th at pp. 1127-1128.) The jury also could find firing multiple gunshots from behind into seated victims "was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' " to kill. (*People v. Anderson, supra*, 70 Cal.2d at p. 27.)

The post-shooting conduct also speaks to defendant's mental state. The killings allowed defendant (or Brown) to take Elarms's purse and flee, facts supporting a motive (to steal whatever they could) and showing a lack of concern for either victim. (See, e.g., *People v. Lasko* (2000) 23 Cal.4th 101, 112 ["defendant's actions after striking the fatal blow were not those of an unintentional killer: he did not call an ambulance, he tried to obscure evidence of the killing"].)

In short, the jury was presented with substantial evidence from which it could find first degree murder of both victims based on a theory of premeditation and deliberation.

*B. Felony Murder*

Defendant contends no substantial evidence supports a theory of robbery murder. Drawing reasonable inferences from the evidence in support of the verdict, we disagree.

The jury could infer there was a plan to rob Cannon, making the killings felony murders. The fact none of the surviving participants to the sale admitted this was the plan does not conclusively negate that idea, as defendant's briefing suggests.

Brown communicated with the seller using a telephone associated with Lynch. The jury could infer the use of someone else's telephone was designed to mask something sinister. The evidence shows the proposed deal was for $70, but Brown and defendant together did not have enough money to complete the agreed-upon transaction. Defendant brought a loaded pistol to the supposed drug sale. After the killings, defendant and Brown divvied up the money from one victim's purse. On these facts, the jury could find both he and defendant (and perhaps Cober as well) planned a robbery from the beginning.

In reaching this conclusion we place no reliance on Cober's testimony about a "lick." That testimony was so confused and contradictory that we will not infer he meant a robbery was planned that night. (See *People v. Raley* (1992) 2 Cal.4th 870, 891 ["Evidence is sufficient to support a conviction only if . . . it ' "reasonably inspires confidence" ' . . . and is 'credible and of solid value' "].) But this does not weaken the other evidence from which the jury could infer a robbery was planned that night. Accordingly, this theory was supported.

(ECF No. 13-3 at 21-23.)

**C.  Discussion**

Sufficiency of the evidence claims raised in § 2254 proceedings must be measured with reference to substantive requirements as defined by state law.  Jackson, 443 U.S. at 324 n.16.  As set out above by the Court of Appeal and summarized by the Ninth Circuit, those standards are:

Under California law, "[a] verdict of murder in the first degree ... is proper only if the slayer killed 'as a result of careful thought and weighing of considerations; as a deliberate judgment or plan; carried on coolly and steadily, [especially] according to a preconceived design.'" *People v. Caldwell*, 43 Cal.2d 864, 869, 279 P.2d 539, 542 (1955) (citations omitted). "Deliberation" and "premeditation" must be construed to require "more reflection than may be involved in the mere formation of a specific intent to kill." *People v. Anderson*, 70 Cal.2d 15, 26, 73 Cal.Rptr. 550, 447 P.2d 942, 949 (1968).

1
2
3
4
5

> *Anderson* explains that in reviewing verdicts of first-degree murder, the court looks to evidence of (1) planning, (2) motive, and (3) facts "from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have [had] ... a 'preconceived design' " that the jury may infer from either motive or planning. 70 Cal.2d at 26–27, 73 Cal.Rptr. 550, 447 P.2d at 949. Such verdicts are typically sustained "when there is evidence of all three types"; otherwise, there must be "at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." [fn 3] 70 Cal.2d at 27, 73 Cal.Rptr. 550, 447 P.2d at 949.

6
7
8
9
10
11

> > [fn 3] We note the California Supreme Court's admonition, however, that the "*Anderson* analysis was intended only as a framework to aid in appellate review; it did not propose to define the elements of first degree murder .... The *Anderson* guidelines ... are not a definitive statement of the prerequisites for proving premeditation and deliberation in every case." *People v. Hawkins*, 10 Cal.4th 920, 957, 42 Cal.Rptr.2d 636, 897 P.2d 574, 595 (1995) (internal citations and quotation marks omitted).

12   Davis v. Woodford, 384 F.3d 628, 639-40 (9th Cir. 2004)

13   This court reviews the decision of the Court of Appeal to determine whether it was

14   objectively unreasonable under 28 U.S.C. §2254(d).  The Court of Appeal examined each of the

15   Anderson factors to determine if it was supported by "substantial" evidence.  California courts

16   define "substantial evidence" as "evidence which is reasonable, credible, and of solid value-such

17   that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  People

18   v. Johnson, 26 Cal. 3d 557, 578 (1980).  The Court of Appeal found substantial evidence of all

19   three Anderson factors.

20   First, the court found evidence showing planning.  The court noted that there was

21   evidence that petitioner brought a gun, stood near the victims' car, stood behind the seated

22   victims, and shot them from behind.

23   With respect to motive, the second Anderson factor, the court held that "[t]he jury could

24   find defendant's plan was to take whatever he could from Cannon, which is why defendant

25   brought the loaded gun in the first place. The jury could also accept as true defendant's statement

26   that he shot Elarms to eliminate a witness."  Further, taking Elarms' purse could be construed as

27   evidence of a motive to kill.

28   ////

Finally, the court found evidence of the third Anderson factor - the manner of killing - showed premeditation and deliberation.  The court noted that petitioner shot Cannon several times, then shot Elarms to eliminate her as a witness, and then shot Cannon again.  "Thus, the jury could rationally find that there were two clear intervals in which defendant could have reflected on the consequences of his actions."  The court also noted the evidence that the victims were shot from behind could have been considered part of a "preconceived design" to kill them.

Petitioner argues there was no evidence of planning.  According to petitioner, the only evidence was petitioner's statement to police that he only shot Cannon because he thought Cannon was reaching for a gun and evidence that the group planned a drug purchase.  There was no evidence anyone in the group intended violence.  With respect to motive, there was no evidence petitioner had a prior relationship with either victim.  Finally, there was no evidence of a particular and exacting killing.  Petitioner describes the shooting as ten, rapidly fired shots that indicate impulsiveness.  (ECF No. 32 at 43-46.)

This court is precluded from either re-weighing the evidence or assessing the credibility of witnesses.  Under Jackson, the role of this court is simply to determine whether there is any evidence, if accepted as credible by the jury, sufficient to sustain conviction.  The evidence cited by the Court of Appeal could have supported a jury determination that petitioner committed the murders with premeditation and deliberation.  In particular, petitioner confessed to carrying a loaded gun and approaching the car with the gun.  The jury was not required to believe petitioner's statement that he shot Cannon only because he thought Cannon was reaching for a gun.  Although the jury could have found that the crime did not rise to the level of first-degree murder, this court does not find, under the Anderson framework, that no rational trier of fact could have found that the murders were deliberate and premeditated.

The same is true for petitioner's argument that the evidence was insufficient to show a planned robbery for purposes of felony murder.  This court cannot say that the appellate court's reliance on petitioner's loaded gun, the theft of Elarms' purse, and the group's divvying up the contents of that purse was so unreasonable that no rational trier of fact could have supported a felony murder verdict with that evidence.

48

This court is mindful of the "sharply limited nature of constitutional sufficiency review" and must apply the "additional layer of deference" required by AEDPA.  Juan H. v. Allen, 408 F.3d 1262, 1274-75 (9th Cir. 2005); see also Jackson, 443 U.S. at 319, 326.  This court finds the state appellate court's rejection of this claim was not objectively unreasonable.  Petitioner's sufficiency of the evidence claim should be denied.

**IV.  Felony Murder Jury Instruction**

Petitioner argued in state court that the evidence was insufficient to support a jury instruction on felony murder.  (ECF No. 17-8 at 94-98.)  He relies largely on the same argument made above – that there was no evidence of intent to commit robbery.  In his traverse, petitioner does not further argue this claim.

A challenge to jury instructions solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  A jury instruction violates due process only if it rendered the trial fundamentally unfair. Id. at 72.  Petitioner fails to make a showing of prejudice.  As described above, the state court was not unreasonable in finding there was evidence of a planned robbery.  Petitioner's challenge to the felony murder instruction should fail.

**V.  Voluntary Intoxication Jury Instruction**

Again, petitioner argued this claim in state court and lists it in his petition but does not pursue it in his traverse.  Petitioner contends the voluntary intoxication instruction given, CALCRIM 625, was error because it told the jury it "may" consider evidence of marijuana intoxication rather than informing jurors that they "must" consider it when determining whether or not the evidence established specific intent.  He further argues that the instruction foreclosed consideration of intoxication on any issues except premeditation, intent to kill, and intent to commit robbery.

Petitioner fails to show this instruction so infected his trial with unfairness that it violated due process.  As the state court pointed out, "the evidence of intoxication due to defendant's smoking an unknown amount of marijuana that night was weak and was not mentioned by the defense during closing argument."  (ECF No. 13-3 at 25-27.)  Petitioner's assertion that there was

1   "ample" evidence he smoked marijuana around the time of the crimes would not necessarily have

2   led the jury to conclude petitioner was so intoxicated that he could not form the intent to commit

3   the crimes.  This is particularly true because the jury saw the video of petitioner's statement to

4   police in which he did not express any lack of memory about the crimes and acted out the events

5   of that night in some detail.  Petitioner fails to show any reasonable possibility the verdict would

6   have been different had the jury been instructed it "must" consider the evidence of intoxication

7   and had it been instructed that it could consider evidence of intoxication not only regarding intent

8   but also self-defense.  Petitioner's claims that the voluntary intoxication instruction violated his

9   due process rights should fail.

10  **VI.  Cumulative Error**

11          Petitioner's final claim is that the cumulative effect of errors violated his due process

12  rights.  The Ninth Circuit has held that "[u]nder traditional due process principles, cumulative

13  error warrants habeas relief only where the errors have so infected the trial with unfairness as to

14  make the resulting conviction a denial of due process."  <u>Parle v. Runnels</u>, 505 F.3d 922, 927 (9th

15  Cir. 2017) (internal quotation marks omitted).  Respondent argues that the United States Supreme

16  Court has never held that the cumulative effect of errors can, itself, amount to a violation of due

17  process.  Whether or not that is the case, cumulative error analysis need not be conducted in this

18  case for the simple reason that the state court, and this court, found only one error – the admission

19  of petitioner's first confession.  Even if the admission of the confession met the fundamental

20  unfairness standard, it must also meet the <u>Brecht</u> standard by having a substantial and injurious

21  effect or influence on the verdict.  This court concludes above that admission of that confession

22  does not meet the <u>Brecht</u> standard.  Petitioner's cumulative error claim should be denied.

23                                                  **CONCLUSION**

24          For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's petition

25  for a writ of habeas corpus be denied.

26          These findings and recommendations will be submitted to the United States District Judge

27  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within thirty days after

28  being served with these findings and recommendations, any party may file written objections with

the court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may result in waiver of the right to appeal the district court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).  In the objections, the party may address whether a certificate of appealability should issue in the event an appeal of the judgment in this case is filed.  <u>See</u> Rule 11, Rules Governing § 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  June 5, 2023

/s/  DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

DLB:9
DB Prisoner Inbox/Habeas/S/delg1084.fr

51